VULCAN LIFE & ACCIDENT INSURANCE
COMPANY, Plaintiff-in-Error, v. MRS. NINA
B. DAVIDSON, Administratrix, Defendant-in-
Error. —395 S.W.(2d) 534.

Western Section at Jackson. June 25, 1965.

Certiorari Denied by Supreme Court October 18, 1965.

Ashley, Malone & Ashley, Trenton, for plaintiff in error.

John F. Kizer, Milan, for defendant in error.

AVERY, P.J. (W.S.). This is a suit by Mrs. Nina B. Davidson, Administratrix of the estate of her deceased husband, Laudon H. Davidson. Nine days prior to the death of Laudon Davidson he was issued a policy or certificate of insurance, which together with the master policy or insurance contract executed by the defendant, Vulcan Life & Accident Insurance Company and the Bank of Yorkville, of which Mr. M. R. Forrester is President. The pertinent part of this certificate is as hereinafter set out.

At the time that particular certificate of insurance was issued the deceased owed the Bank of Yorkville balance of $5,000 plus, evidenced by note which the deceased executed to one Lynn Boyett on December 5, 1960, in the original amount of $7285.09 for the purchase of a D/M D-6 Caterpillar Bulldozer "costing $8,500." This note was endorsed or transferred to said Bank together with a chattel mortgage of the same date executed by the deceased, Laudon H. Davidson, and was due and payable "eight months from date". At the time this note was executed or at the time it was transferred to the Bank he procured insurance in the amount of $5,000, with the

same company, and the record reveals that Mr. Forrester who procured that first insurance for deceased, also procured the policy or certificate that is here involved. The record reveals that the first insurance lapsed or was cancelled on default in payment of a subsequent premium in 1961. The basis for this suit is the certificate issued January 8, 1963.

On June 3, 1964 this suit was filed. The declaration sets out the issuance of the policy or certificate of insurance here involved; the death of the assured, Laudon H. Davidson; that the debt evidenced by the note above referred to had been paid; that the plaintiff qualified as administratrix; made demand for payment of the amount of insurance; made copies of the certificate and the master policy issued to the Bank as exhibits to the declaration. That she as the widow of the assured is entitled to the insurance shown by the policy; that the company only refused to pay the same on May 23, 1963, on which date it sought to return the prepaid premium through its Yorkville Agency, and that the check was refused and never cashed by the plaintiff, which check is tendered to the defendant through the filing of this declaration.

The declaration alleges that such refusal was made in bad faith as contemplated by T.C.A. Section 56-1105; that it has been necessary to employ counsel and that she is entitled to the original principal, plus interest, plus 25% penalty under the statute, the amount laid in said declaration being $10,000.

All parties were properly brought before the Court and defendant, Vulcan Life & Accident Insurance Company, filed a plea of general issue, and further plead that in event such insurance contract was issued it was done on the statement that the deceased was in sound health, at

the time, which was not true, and other conditions of contract which may have voided or invalidated the alleged contract of insurance.'' The plea then denies any bad faith on the part of the defendant.

The case was tried before the Honorable Dick Jerman, Judge of the 13th Judicial Circuit, including Gibson County, Tennessee, sitting without a jury, the same having been waived, on the 10th day of December 1964, who found the issues in favor of the plaintiff, rendered judgment in the principal amount of $5,000 with interest at the rate of 6% from February 23, 1963, and in the judgment the interest is fixed at $539.17. The whole judgment being $5,539.17 and cost of the case.

A motion for new trial was seasonably filed, after exceptions were saved to the judgment, and notice that motion for new trial would be filed. The motion was duly heard by the Court, overruled in its entirety, to that action exceptions were saved, appeal in error prayed, granted and perfected to this Court, where the case was heard on the 26th day of May, 1965, taken under consideration and now being disposed of by this opinion.

The assignments of error, five in number, are short and are as follows:

''1. There is no material evidence to support the judgment.

''2. The evidence preponderates against the judgment.

''3. The Court erred in holding and adjudging that the 'Creditor' under the subject insurance policy determined whether the insured was in sound health at the time the insurance policy was issued.

''4. The Court erred in holding and adjudging that the physician's testimony stated that the insured was

in sound health at the time the insurance policy was issued.

"5. The Court erred in holding and adjudging that the insured was in sound health at the time the insurance policy was issued to the insured."

While this is an appeal in error, the case having been tried before the Court without a jury, the plaintiff below, who is defendant-in-error here, has requested that the Court hear the matter as on a simple appeal and as such defendant-in-error assigned as error:

"The Trial Court erred in refusing to grant the penalty provided by Section 56-1105 Tennessee Code Annotated, for refusal of Defendant to pay benefits under the policy in bad faith."

And has requested the Court to affirm the judgment below together with the penalty as prayed for in the original declaration.

It should be said here that while a member of this Court was preparing this opinion the Supreme Court of the State of Tennessee filed an opinion for publication in the case of Vulcan Life & Accident Insurance Company v. Segars, 216 Tenn. 154, 391 S.W.(2d) 393, which was filed in this Court this day and which involved identical original creditor contract as in the present case, and an identical certificate of insurance as in the present case. That case was carried by certiorari to the Supreme Court to an opinion from this Section of the Court of Appeals of Tennessee, which opinion was prepared by the writer of this opinion. We held in that case that taking into consideration the provisions of the master contract between the Vulcan Life Insurance Company and the First National Bank of Savannah, that:

1—They created an ambiguous contract and that the ambiguity was such that it was apt to mislead the insured.

2—That the insurance company was estopped to deny liability under the peculiar facts of that case.

We were reversed as to the first proposition of ambiguity in the contract, but were sustained in the second one, and the judgment entered by this Court was affirmed.

It might be said that the writer has not changed his opinion with respect to the ambiguity of that contract, notwithstanding the peculiar verbiage of the opinion of the Supreme Court, as the facts are shown by the record in that case, and this opinion filed in this Court today in the above styled case. We accept completely the supremacy of the Supreme Court over this Court, yet our mental reactions do not change when based on particular facts as stated in our prepared opinion.

Mr. Davidson became ill and required physical examination; put himself in the care of Dr. F. Earl Williamson of Jackson, Tennessee on April 26, 1962, who possessed all of the necessary qualifications as stated in his deposition which appears in this record, and who was a diplomat of the American Board of Surgery and a Fellow of the American College of Surgery. Dr. Williamson describes that disease at that time in the following words:

"I first saw Mr. Davidson on April 26, 1962, at that time with symptoms of vascular insufficiency in his legs, and following this and on May 6, 1962, he was admitted to the hospital here in Jackson, where translumbar aortogram was done, which revealed that he had a partial occlusion of his terminal aorta."

Dr. Williamson describes that in ordinary terms with the following statement: .

"Well, it means that the main artery to his body, and the artery which carries the blood vessels to his legs was partially stopped up. * * * He was then admitted to the hospital again on the 14th of August 1962, at which time he was operated on, and an aorticoiliac bypass graft was inserted. * * * This is a synthetic graft material that is made in the form of a Y, and it is simply sewed in above and below the obstruction in the blood vessel to bypass the blood around the stopped up portion of it."

This operative procedure is referred to as a serious or a major operation. Dr. Williamson continues to describe that operation in the following words:

"About the second or third post-operative day after this, this man had a wound dehiscence, which means that his wound, operative wound partially came apart, and following this he had a secondary closure, or, in other words it was—he was—the wound was reclosed. Then he was dismissed from the hospital on the 29th of August, to be followed up here in the office. * * * Then he developed an incisional hernia in his operative wound following this, and was seen on one or two occasions here at the clinic because of this; apparently he was doing well, as far as his artery surgery was concerned, and was planning to go back to work but was unable to do so because of his hernia, primarily. So, it was decided, and he was readmitted to the hospital on January 9, 1963, for repair of his hernia, which was done a few days later, and in the postoperative period, I guess about the second postoperative day, he developed an occlusion, apparently, or a throm-

bosis of the previous plastic graft which had been inserted, along with what must have been a complete occlusion of his aorta, the original blood vessel, and this—an attempt was made after this to remove the thrombus and clean out the graft to restore the circulation to the extremities, and this was unsuccessful, and he actually developed gangrenous changes in both lower extremities, along with a kidney failure, or azatemia we call it, and died on the 17th of January, 1963. * * * "I saw him here at the Clinic on January 3, 1963. * * * He was unable to do his work, and we had tried to get along without doing any more of it, but in view of the fact that he couldn't, we decided to go ahead and repair the hernia, and he knew it at that time. * * * That is when we made the arrangement, yes sir." (Meaning that the date of January 9, 1963 had been set previously in some conversation with Mr. Davidson.)

Dr. Williamson explained that this operation for the hernia was in close proximity to the area of the former surgery, and that particular dangerous situations might develop, saying: "There are several things that could occur." He explained what these were and then he said:

"I would think from his, that the way this happened that it was most likely, or must have been the result of some hypertension that resulted maybe after his surgery that was not recognized immediately, that might have been responsible for it."

In speaking of this particular clot and the herniated condition, he said:

"A graft has to be there before it can clot, but I think there was no indication to this that he had—was having

any trouble with it prior to the time that he had his hernia repaired. \* \* \* If he had not been operated on he never would have had the incisional hernia. \* \* \* An incisional hernia is simply a weak point in an operative incision that has been made, for any type operation.''

Dr. Williamson explains on cross examination, that he could find no clinical evidence that Mr. Davidson was having any trouble at all with the former operation, at the time he was examining him with respect to this herniated condition:

''Q5—And he appeared to you to be in good health at that time, didn't he?

A—Yes, sir, other than the hernia, which we—

Q6—The hernia. Now, when he came back and entered the hospital on January 9th, he still appeared to be in good health, did he not?

A—Yes, sir.

Q7—And isn't it also true that at that time you could find no clinical evidence of any trouble he was having with his operation?

A—That is correct.''

Dr. Williamson said when he was examining Mr. Davidson in October of 1962 relative to this incisional herina, he was having no trouble otherwise and except for the hernia he would be in good health, and in answer to a question with respect to his appearance when he entered the hospital, Dr. Williamson stated that on January 9th he still appeared to be in good health and that he could find no clinical evidence of any trouble he was having with his former operation. He stated that he discussed

the entire situation with Mr. Davidson; that neither of them were alarmed at the proposed operation for the hernia repair, and that nothing he had said to Mr. Davidson nor anything that Mr. Davidson had said to him indicated that Mr. Davidson thought the proposed operative procedure would be fatal. He was asked if he did not think the last surgery would be a minor procedure, he said:

"Well, I think a hernia repair per se is usually classified as a minor procedure,—there are all degrees of them. This was a fairly large incisional hernia and I don't think would be classified as one of the groin hernias, of that minor a procedure, but it is not a—as we compare operations, it is not a tremendous operation."

He went on to state that he discussed with Mr. Davidson at that time the procedure in repairing that hernia, and said:

"* * * he could resume operations of his dirt-moving equipment in the spring of 1963."

He said:

"There is no reason to believe that there would have been any undue risk from this surgery."

The doctor further stated that both from an objective and subjective standpoint Mr. Davidson seemed to be doing quite well. He further stated that after the death he was approached about the matter and procured from Mrs. Davidson authority to furnish the Vulcan Life Insurance Company any information that it desired relative to the illness and death of Mr. Davidson. This authorization was given in writing and was dated 23rd day

of March, 1963, and that Mr. Forrester witnessed the execution of that authorization typed on the letterhead of the Yorkville Insurance Agency, Bank of Yorkville, Yorkville, Tennessee.

The doctor said he gave a letter to a Mr. George N. Bass, Assistant Vice-President of Vulcan Life Insurance Company, 1807 Warfield Drive, Nashville, Tennessee, on April 27, 1963. He did not know if Mr. Bass had talked to anyone else in the Jackson Clinic, but any discussion he might have had with any representative from the Vulcan Life Insurance Company was subsequent to March 23, 1964. He was shown an "Attending Physician's Statement To Be Completed In Lieu of Death Certificate", in which he shows the death of Mr. Davidson to be caused by, "Thrombosis, progressive, terminal aorta and bypass graft". It is on the same sheet of paper with report "To Be Completed By Creditor".

Many questions were asked Dr. Williamson how he considered the effect of this hernia on the general health of Mr. Davidson, and in his opinion what Mr. Davidson thought about it is shown in conversations with him, and the doctor's explanation to him, and taking all of his testimony, consisting of direct, cross, redirect and recross, is to the effect that in his opinion Mr. Davidson had no reason to believe that there was anything tremendously serious with respect to his general health and neither did he. He was asked and answered the following questions:

"Q9—That is because the heart, in particular in this man's case, because of his occlusion his incisional operation would have been of more risk and danger than any other type of patient?

A—I don't—I didn't feel that it was any more risk, no, sir.

Q10—It was something I know that had to be done, but I am asking that question in reference to his peculiar condition?

A—No, I don't know that it had to be done. This was an elective procedure, there was no emergency or anything about this, and I—this is not something that had to be done, because we had put it off to see if he would get along with it all right, which he didn't seem to be doing. It was a fairly large hernia, an elective procedure, I had every reason to believe that he would be fine, would have it repaired and get back to work.''

He did explain, however, that he told Mr. Davidson the operation would be done under an anaesthesia.

The duplicate insurance certificate given to the insured is filed as an exhibit to the testimony of Mrs. Nina B. Davidson. It should be said here, because of the recent decision of the Supreme Court respecting an almost identical certificate, that in the Segars case the certificate issued on Form F-C-1-59, while in the instant case the Form of the certificate is F-C-3-61. Further, the original insurance contract between the creditor, First National Bank and the Vulcan Life & Accident Insurance Company exhibited in the Segars case, was Form KLP-F-1-59, while in the instant case the master contract between the Bank of Yorkville and the Vulcan Life & Accident Insurance Company is Form KLP-F-3-61. Form F-C-1-59 indicates the form used in 1959 and Form F-C-3-61 indicates the form used in 1961. There are some changes in these forms and specific attention will be called to these changes, though they are not material, as we view it in

the present case, but they were material in the other case because of the difference in the cancellation clauses. Another difference in the two cases is that in the Segars case the certificate issued was a "Monthly Decreasing Insurance" certificate, while in the instant case the certificate issued is a "Level Amount Insurance". The involved certificate is in the following words and figures:

Form F-C-3-61

"Duplicate—Give to Insured

Vulcan Life and Accident Insurance Company

Birmingham, Alabama

"THE VULCAN LIFE AND ACCIDENT INSURANCE COMPANY HEREBY CERTIFIES THAT UNDER and subject to all of the terms and conditions set forth below and on the reverse side hereof and of Master Group Insurance Policy issued to the Creditor named herein, it insures, upon payment of premium, the insured named below against (a) Death of: or (b) Permanent and irrecoverable loss of the entire sight of one or both eyes, or of one or both entire feet by severance or amputation at or above the ankle, or of one or both entire hands by severance or amputation at or above the wrist, provided such loss results from, and within 90 days after injury caused solely by external violent and accidental means, while this Insurance is in force, in the amount of insurance and for the term set forth below, said amount of insurance to remain constant if checked below for Level Amount Insurance, or to decrease by the amount of each equal monthly installment as same is due if checked below for Monthly Decreasing Insurance, for the number of months set forth below.

"The proceeds of said insurance payable to the Creditor named below as its interest may appear; and the balance of the proceeds, if any payable to the Insured, if living; otherwise to the Secondary. Beneficiary, if named below, and if not named, then to the Estate of the Debtor.

"This insurance shall not take effect hereunder unless the Insured-Debtor named herein is alive and in sound health and is between the ages nearest birthday of 18 to 65 years, both inclusive, on the effective date hereof.

"IN WITNESS WHEREOF, The Vulcan Life & Accident Insurance Company of Birmingham, Alabama, has caused this Certificate to be countersigned by a duly authorized agent of the Company on the date of the loan which is the effective date hereof.

| "Check One | X Level Monthly | Amount Insurance Decreasing Insurance | Creditor-Debtor Insurance Only GROUP CREDIT INSURANCE CERTIFICATE | | |
|---|---|---|---|---|---|
| Amount of Insurance | No. Months | Premium | Age | Name of Creditor | |
| $5000.00 | 12 | $100.00 | 60 | BANK OF YORKVILLE | |
| Name and Address of Insured Landon H. Davidson | | | | Name of Secondary Beneficiary Relation | |
| Effective Date 1/8/63 | Countersigned: M. B. Forrester | | Andrew J. Lewis, President." | | |

On the reverse side of this paper there is printed the following:

"EXTRACTS IN SUBSTANCE FROM MASTER POLICY PERTAINING TO INDIVIDUAL DEBTOR.

1—TERM OF INSURANCE. The term of insurance as to any Debtor under the age of 61 nearest birthday shall be the period stated in this individual certificate

for which premiums are paid but not to exceed thirty-six (36) months as to any Level Amount of insurance and not to exceed sixty (60) months as to any Monthly Decreasing Insurance. The term of insurance as to any debtor between the ages nearest birthday of 61 to 65 years, both inclusive, shall be the period stated in this individual certificate for which premiums are paid but not to exceed twelve (12) months as to any level amount of insurance and not to exceed twenty-four (24) months as to any Monthly Decreasing Insurance.

2—AMOUNT OF INSURANCE. The amount of insurance as to any Debtor shall be the amount stated in this individual certificate for which premiums are paid but not to exceed $5,000.00.

3—AGES. All ages set forth are ages at nearest birthday at time insurance is written.

4—REFUND OF PREMIUM CLAUSE. If any premium paid under this contract includes any amount of insurance upon the lives of persons who are not eligible for insurance hereunder or for any insurance in excess of the amount of indebtedness eligible for insurance under Clause 2 above or for term of insurance in excess of term stated in Clause 1 above, such persons or such excess shall not be insured hereunder, and the Company shall refund such amount to the Creditor upon demand. In the event the Debtor pays his indebtedness prior to its scheduled maturity date this insurance may be cancelled or continued by the Insured in accordance with the laws and rules and regulations of the state in which the indebtedness is contracted. In the event of cancellation of the credit insurance prior to the expiration date, the return premium due shall be promptly paid to the person entitled thereto.

MISSTATEMENT OF AGE. No misstatement of age of the Debtor shall affect this policy except as follows:

If, at the time the insurance was written, the correct age of Debtor at nearest birthday was more than 65 years, the only liability of the Company is the return of the net premium received by the Company, no person whose age as of his nearest birthday is more than 65 years at the time the insurance on such person is written being insured under this contract.

CANCELLATION OF INSURANCE. If, in the sole judgment of the Company, the Insured-Debtor is found to be unacceptable as an insurance risk on this plan, the insurance may be cancelled by notice to that effect, mailed by the Company to the *Creditor Beneficiary,* accompanied by a check for the return of premium received, if any, by the Company, within 30 days from the date the completed certificate is received in the Home Office of the Company.''

In the original specimen copy filed as exhibit in this case of the contract between the Bank of Yorkville and the defendant, Vulcan Life & Accident Insurance Company, the statements here involved are the following:

''INDIVIDUAL CERTIFICATE: The Creditor is hereby authorized to issue certificate of insurance on the Company's forms to the debtor when the latter has complied with the requirements for coverage hereunder and when the *Creditor believes him to be alive and in sound health.* The Creditor is further authorized to collect the premiums due from debtors for such coverage, in accordance with premiums quoted in the paragraphs headed Premium Calculations.'' (Emphasis added.)

This contract provides two methods of cancellation, one of the involved certificate and one of the master policy.

"CANCELLATION OF INDIVIDUAL CERTIFI-CATE: If, in the sole judgment of the Company, the Insured debtor is found to be unacceptable as an insurance risk on this plan, the insurance may be cancelled by notice to that effect mailed by the Company to the *Creditor Beneficiary,* accompanied by a check for the return of premium received, if any, by the Company, within 30 days from the date the completed certificate is received in the Home Office of the Company. (Emphasis added.)

"CANCELLATION:—This policy is subject to cancellation by either the Company or the Creditor at any time by giving thirty (30) days written notice to the other party and no person becoming a Debtor of the Creditor after the effective date of such notice shall be insured hereunder. If this policy should be cancelled by either party, all insurance written and paid for prior to the effective date of cancellation shall remain in full force as provided herein and in the individual certificate for the period for which said premiums are paid.

"INCONTESTABILITY:—This policy shall be incontestable after thirty days from the date the completed certificate is received in the Home Office of the Company, except for fraud or nonpayment of premiums, as to insurance upon the life of any Debtor becoming insured hereunder.

"ENTIRE CONTRACT:—This policy together with the application of the Creditor, a copy of which is at-

tached hereto and made a part hereof, and the individual certificate of the debtors insured hereunder, shall constitute the entire contract between the parties hereto. All statements made by the Creditor shall, in the absence of fraud, be deemed representations and not warranties, and no statement shall be used in defense of any claim under the policy unless it is contained in the written application of the Creditor attached hereto.

"CLERICAL ERROR:—The insurance of any Debtor shall not be invalidated by the Creditor's failure, due to clerical error, to give proper notice to the Company of such Debtor's application for insurance, if the premiums paid include an amount for insurance upon such Debtor, and in the sole judgment of the company, the debtor would be an acceptable risk under this plan."

It is observed here that in the paragraph hereinabove designated "Incontestability" the period of time is fixed therein at "thirty days from the date the completed certificate is received in the Home Office of the Company", while in the contract which the Court had under consideration in the Segars case, that period of time is fixed at "one year from the effective date of the individual certificate". Attention is directed to the fact that no where in the master policy nor in the individual certificate issued to the insured, as therein provided, is there any notice of cancellation to the person insured.

Mr. Robert M. Guillot, Secretary of the defendant, Insurance Company and Manager of Group policies, was introduced as a witness. It seems he was introduced for the purpose of detailing facts which would indicate the company had not acted in bad faith in connection with

the particular issues in the instant case. He verified the fact that Mr. Davidson had only been insured by his company on two occasions. One in 1960 and the other in 1963.

With reference to the claim filed in this case he stated that the claim, after the death of Mr. Davidson, had already been processed and came over his desk, and that on March 5, 1963, check No. 363265 in the amount of $5,000 had already been drawn and was ready to go out. His statement in that regard is this:

"This claim had already been processed and was ready to go out, and, of course, under our group policy and the certificate of insurance, the insured—purported insured, is suppose to be in sound health at the time the certificate is written by the agent and there was some question which had come up on this. It had come up prior to that time when the death certificate had been sent in * * * From the certificate of insurance that had been sent by Mr. Forrester, which was—we received that, if I recall, on or about January 25, 1963 —and we at that time sent Mr. Forrester this death claim form for him to complete and have the attending physician complete or the undertaker or somebody."

He explained conversations with Mr. Bass, State Field Director for Vulcan Life regarding an investigation and directed him to get Mr. Forrester to obtain statement from Mrs. Davidson to authorize defendant to contact the doctor who took care of him, after the matter had been referred to the medical department. He said this must have occurred the latter part of March 1963. He exhibited a letter as Exhibit 1 to his testimony written by Dr. Williamson on April 27, 1963, to Mr. George Bass, Assistant Vice President of Vulcan Life & Accident Insurance Company.

He further testified that the denial of liability was forwarded to Mr. Forrester, as the agent of the company in May of 1963. His statement is that at that time they had decided to deny liability on that contract. He said they received a notice that the policy had been issued and the claim on account of the death of Mr. Davidson on the same day. This statement illustrates exactly a part of what we mean when we say that the provisions of this policy, taking the whole contract together with certificate issued, are ambiguous.

The creditor bank is given the opportunity to send these notices of the issuance of the certificate and premiums paid once a month. They issued the certificate, as in this case, on January 8th, but that certificate did not reach the Vulcan Insurance Company until January 25th. So, if the insurance had not been in effect, the effectiveness of this particular provision as invoked by the insurance company, gave them not only thirty days from the issuance of the certificate, which was a provision in the contract in the Segars case, but also extended that time in that case for thirty additional days from the time it had received that certificate. In the instant case it is admitted that regardless of when the certificate was dated, that there was no notification of denial of liability, no notice of contest, no notice of refusal to pay and no notice of cancellation of any kind that ever went to anybody within even thirty days after the certificate had been received by the company.

He identified a letter which he had written to the Honorable John F. Kizer, Attorney for the plaintiff, which is filed as Exhibit 2 to this cross examination, in which he said:

"We still contend that Mr. Davidson was not insurable at the time this certificate was written and that we so notified the bank within thirty days after receiving the certificate of insurance in our Home Office."

Notwithstanding that statement in the letter, it is clear from the proof by the Bank, from the exhibits filed as well as the testimony of Mr. Forrester and Mr. Guillot, that no cancellation of that policy was undertaken within thirty days after that certificate was issued or within thirty days after it was received by the company, notwithstanding the fact that they contend they received, and the proof reasonably so shows, the claim on account of Davidson's death the same day they got the certificate from the Yorkville Bank.

It is the strong contention of the plaintiff that for many reasons the company is estopped from denial of liability under this policy.

Under the clause set forth in the paragraph showing that the policy was incontestable after a period of thirty days from the time it was received in the office, it is insisted that any defense with respect to the issuance of the certificate for any purpose, except for the fraud on the part of the insured, is not available. The authority for this statement is the old case of Humpston v. State Mutual Life Assurance Co., 148 Tenn. 439, 256 S.W. 438, 31 A.L.R. 78. That is the case in which fraud was alleged in written application for insurance by one Humpston. In that policy there was an incontestable clause of one year, the assured died during that period after the issuance of the policy. The policy in that case was dated March 7, 1919. The defendant died November 29, 1919, within less than a year after the policy was issued as result of Bright's disease.

The defendant's motion for a directed verdict in the trial court was sustained by that Court in the first suit and judgment was entered dismissing plaintiff's suit. On appeal to the then Court of Civil Appeals the judgment was reversed and the motion which had been made for directed verdict by the plaintiff was sustained and the case went to the Supreme Court on writ of certiorari. That Court said there were three questions involved, using this language:

"The first is, Did defendant's letter of January 30, 1920, in which it denied the justice of plaintiff's claim, and refused to pay the same, amount to a rescission of the policies? and the second is whether or not the policies are contestable at all by defendant, in view of the incontestable clauses contained therein and the facts; and, third, did plaintiff waive said incontestable clauses by his failure to rely on them in his pleadings?"

In that case suit was brought two days before the expiration of the period set out in the incontestable clause, which in that case was for non-payment of premium. The Court held that that was a contractual relationship and the fact that the insured died during that period of time; that though suit had been brought, and that a letter had been written setting out some reason for denying the liability within the period, that no effective effort had been made under that clause which fixed the liability of the company as an incontestable matter except for the non-payment of dues, which is similar in this case for the "non-payment of dues or for fraud."

In Scales v. Jefferson Standard Life Insurance Company, 155 Tenn. 412, 295 S.W. 58, 55 A.L.R. 537, there was involved an incontestable clause which recited that:

"After this policy shall have been in force for two whole years from the date hereof it shall be incontestable for any cause except for non-payment of premium. (b) In case of self-destruction committed whether sane or insane, within two years from the date hereof, the extent of recovery hereunder shall be the premiums paid."

The insurance was issued on July 26, 1924, the insured committed suicide on July 15, 1925, and in August following tender was made by the Insurance Company to the beneficiary of the premiums paid, $55.75, which was rejected. This tender was continued and made into Court on the filing of this suit by the beneficiary, father of the insured. The suit was brought July 27, 1926, one day after the expiration of the two years from the date of the policy, and a year and twelve days after the death of the insured. The company defended on the ground that the policy not having been in force for two years from the date to the death, there could be no recovery.

The case of Humpston v. State Mutual Life Assurance Company, 148 Tenn. 439, 256 S.W. 438, and Thistle v. Equitable Life Assur. Soc., 149 Tenn. 667, 261 S.W. 667, not cases of suicide, the Court said in the Scales case with respect to those cases:

"It was held by this court in Clement v. New York Life Insurance Co., 101 Tenn. 22, 46 S.W. 561, 42 L.R.A. 247, 70 Am.St.Rep. 650, that incontestable clauses inserted in insurance policies similar to the one in question are reasonable and valid, and that the practical and intended effect of such a clause is to create a short statute of limitation in favor of the insured, within which limited period, the insurer must, if ever, test the validity of the policy.

The court in that case said:

"It has been well said: 'The effect of the provision is to prevent the insurer from interposing as a defense the falsity of the representations of the insured, which is a fraud. But it does not prevent abandonment, rescission, and cancellation of the contract for such fraud, provided the action for that purpose is brought within a year'."

While there are two provisions in the incontestable clause involved in the instant case, one being non-payment of dues and the other fraud on the part of the assured, the time fixed for notifying the party with respect to the cancellation of the policy is thirty days after the certificate is received in the home office, except for fraud.

■■ We have hereinbefore stated that there was a general issue plea and that there was a further plea that if issued, the policy or contract was entered into from the statement that he was in sound health. While there is no statement expressly in the plea that such statement was fraudulent or was entered into for the purpose of fraudulently securing insurance, when he knew himself to be in bad health or at least not in sound health. If we assume that the plea is broad enough to cover allegations of such character, if and when properly proven, we enter upon the study of the question that when fraud is plead as a defense to a contract, insurance or otherwise, the burden of proving such fraud is upon the one who pleads it. In this case the burden is upon the defendant to show that there was material fraud on the part of Mr. Davidson in securing this insurance policy.

In the Segars case which is hereinabove referred to, Mr. Segars had a heart attack shortly before he made

application for this insurance, which was issued on a Saturday and he died with an additional attack the following Monday. He had owed the bank and continued to owe it at the time this insurance was issued, just as in the instant case. He increased the amount of the then owing debt by several hundred dollars and executed a new note the very day the insurance was issued to him. Mr. Williams, the official of the bank in that case and the one who issued the certificate, said the question of the issuance of insurance "came up from him", meaning the debtor who was insured by the issuance of the certificate at that time. In that opinion it is said:

"'As a general rule the insurer is precluded from asserting a ground of forfeiture resulting from mistake, fraud, or negligence of the agent without the knowledge or collusion of the insured.' 45 C.J.S. Insurance, sec. 728, page 733; Dickens v. St. Paul Fire and Marine Insurance Co., 170 Tenn. 403, 95 S.W.2d 910 (1936); Hale v. Sovereign Camp. W.O.W., 143 Tenn. 555, 226 S.W. 1045 (1920)."

The opinion then on authority of the case of Henry v. Southern Fire & Cas. Co., 46 Tenn.App. 335, 330 S.W. (2d) 18 (1959), laid down the following rule, taken from 29A Am.Jur. Insurance, Section 1049, page 219, saying:

"'In an action on a contract of insurance, the insurance company is generally considered estopped to deny liability on any matter arising out of the fraud, misconduct, or negligence of an agent of the company. If either party must suffer from an insurance agent's mistake, it must be the insurance company, his principal'."

The Supreme Court also said in the Segars case with respect to the knowledge of the agent, and what he did in obtaining that insurance:

"He knew or should have known the insurer would deny liability in the event it was determined the insured was not of sound health when the policy was issued. He took that chance which resulted in this lawsuit. His act was the act of the insurer and the company should be the party to suffer."

 Certainly it was within the scope of the authority of the agent to inquire with respect to the health condition of an applicant for insurance. Let us see now just exactly what Mr. Forrester says was said to him in the instant case, which would indicate that Mr. Davidson was undertaking to practice a fraud upon him. Mr. Forrested had written the prior insurance for Mr. Davidson which had lapsed. He stated:

"* * * he told me that he had been in the hospital and had surgery, but that he—said, 'I am feeling fine and I am ready to go back to work now'—'I feel better than I have felt in a long, long time. I am able now to go back to work'.—Yes, he told me he had had surgery."

He was then asked:

"Q23—Did he say anything about having to have another one?

A—No, I don't recall him making a statement like that.

Q24—By his conversation with you and the statements he made to you—did you, or did you not, conclude that he was in good health?

A—Well, I assumed from the statement he made to me that the man was in good health. I mean, in a condition that I could write insurance.''

He then stated he heard nothing else from Dr. Davidson, but that he recalled:

''I believe Mrs. Davidson came down to find out about filing a claim. I believe that's the first I knew, and I executed the papers and forwarded them on to the company for processing.''

It is obvious from the facts shown in this record as a whole from all of the testimony, that Mr. Forrester held certificate of insurance, which he, as an official of the ''Creditor'' was authorized to and did issue, there in his office, not only until after the man died, but continued to hold it until after a claim was made out for insurance after the death of Mr. Davidson by the administratrix of his estate, Mrs. Davidson. The above information is shown in his direct examination. His direct examination also shows the Bank of Yorkville, who is listed not only as a ''Creditor'' and authorized to determine if Mr. Davidson ''was alive and in sound health'', had nothing to do with the issuance of the certificate, but as a matter of fact he, as the agent of the company, independent of any action by the Bank, was the acting insurance agent that issued this particular insurance certificate.

He testified that on December 8th prior to the issuance of this certificate in January of 1963, Mr. Davidson told him that he wanted insurance, but did not have money to pay premium then; he does not recall asking him what kind of surgery he had at any time, but on cross examination when being question with respect to how that any certificate of insurance on the part of any debtor issued, he said:

"* * * my responsibility as Agent for the Company—
is to ask the insured 'Are you now in good health?'
and if I ask him that he tells me 'Yes, I am in good
health', and I have no other reason—other than to be-
lieve him, then I am at liberty to write the insurance,
but if he tells me that he is not in good health and I
write the insurance, then I think I'd be voiding my
contract with the Company, naturally."

He further stated that as a matter of fact there was no
application required by a debtor. He was asked:

"Q37—Now, Mr. Forrester, after Mr. Davidson told
you that he had had surgery and—but was feeling fine,
why you let it go at that?

A—Yes, I assumed—from his statement now—I as-
sumed from his statement that Mr. Davidson was in
good health, after surgery—which—just hundreds of
people have surgery and are—and are ready to go back
to work.

Q38—And you didn't even ask him what kind of sur-
gery it was?

A—I didn't—I don't remember asking him that, be-
cause I didn't think it was necessary because the man
told me he was alright—he was in good health—felt—
felt good.

Q39—He felt Good?

A—Yes, sir.

Q40—That's the statement he made to you?

A—Yes, sir.

He further stated on cross examination that back in
December 1962, Mr. Davidson came in to pay the interest

on his note, and at that time told him that he wanted to take the insurance, but that he didn't have the money that day but that he would be back and would want to take the insurance, and that he told him:

" 'All right, we'll discuss it when you come back'.

Q45—All right, So you issued the policy?

A—That's right.

Q46—And there was no question about the policy being in effect at the time of his death on January 17?

A—No, that's correct.''

He admitted that he had testified in a discovery deposition when he then had a check before him which he obtained by right of counsel for plaintiff, payable to Vulcan Life Insurance Company in the amount of $234.48; that he neither submitted Mr. Davidson's certificate to the Company nor the money representing the part of premium due the company on Mr. Davidson's insurance until January 22, 1963, and that the check was cleared by the Bank in Birmingham on February 1, 1963, so evidently that is when they got credit for it and it was endorsed by Vulcan Life & Accident Insurance Company. He admitted further that he was asked:

"At that time also, could you have submitted Mr. Davidson's prior to that time? Answer: 'No, sir, because I always pay them in a group'. Question: 'Why would you have held it from the 8th of January until the 22nd of January?' Answer: 'We have 30 days in which to remit to the Company—sixty—have gone as high as 60 days'.''

It would thus appear from this testimony that the company and its agent had a loose way of doing business,

notwithstanding the provisions in the contract which they insist upon at this time to defeat the payment of this claim, and there is nothing to indicate that the company enforced its rules and regulations with respect to the Bank, which is the ''Creditor'' or with its agent with respect to the issuance of a certificate or accounting for the premiums received.

It was during his cross examination that the letter he wrote to the Vulcan Life & Accident Insurance Company advising them of the death of Mr. Davidson, was not until February 23, 1963, and he stated that he did it at the time Mrs. Davidson came down and made out the claim. Copy of that letter is filed as Exhibit 1 to the cross examination of Mr. Forrester and is found in this record between pages 63 and 64. In it he states that when Mr. Davidson told him how he felt, he also told him the operation was ''last fall.'' This is inconsistent with his statement on the witness stand that Mr. Davidson did not tell him when the surgery was performed.

In the instant case we have a situation where Mr. Forrester is the active President of the Bank, who is referred to as the ''Creditor''. He also operates the Forrester Insurance Agency. He said that the Forrester Insurance Agency is the agent that wrote this insurance. The master contract between the insurance company is not with the Forrester Insurance Agency, it is with the Bank of Yorkville. That Bank is referred to as ''Creditor'' or as ''The Creditor''. That Bank is so designated in this master policy and in this certificate which embraces the whole of the contract of the insurance company with the Bank.

So it is that when this master contract between the insurance company, defendant in this case, with the Bank

of Yorkville, "The Creditor", as we have pointed out on page 12 of this opinion, the certificate of insurance issues "WHEN THE CREDITOR BELIEVES HIM TO BE ALIVE AND IN SOUND HEALTH", and then it concludes with this statement:

"The Creditor is further authorized to collect the premiums due from debtors for such coverage, in accordance with premiums quoted in the paragraphs headed Premium Calculations."

We again desire to state that this master policy and the certificate no where authorizes any one to determine the health and life of the assured except "THE CREDITOR". Yet, we have in this particular case an insurance company admitting that an insurance certificate was issued to the decedent, and that at the time that certificate was issued it was determined by the "Creditor" that Mr. Davidson, the insured, was alive and in sound health. That creditor is the primary beneficiary. We have the Forrester Insurance Agency saying that it is the insurance agent of the Vulcan Life & Accident Insurance Company. We have a contract from the Vulcan Life & Accident Insurance Company with the Bank of Yorkville saying the Bank of Yorkville is its agent. We have both the Bank of Yorkville and the insurance company acknowledging that the Bank of Yorkville is the primary beneficiary under the contract. We have an insurance company undertaking to say that though we have a contract with the Bank of Yorkville, it is not so, and though we authorize that Bank to determine the health of an applicant for insurance, we are not going to agree that it did it properly. We are going to reserve the right to cancel that insurance within 30 days after we receive the certificate as though it had never been issued, and further

reserve the right to cancel it at any time for fraud on the part of the insured.

Has the insurance company authorized the Bank to do anything or did the Bank-Creditor have anything to do at all? Mr. Forrester says:

Q49—Now, Mr. Forrester, the plaintiff, by Mr. Kizer as counsel, amended the declaration at the beginning of this case and I understand the amendment to mean that the insurance written to Mr. Davidson was issued through the bank. I understand that to be the substance of the allegation.

MR. KIZER: That's the substance of the allegation, yes, sir.

Q49 (cont'd) Now, I ask you, if the bank had anything to do—the Bank of Yorkville, with the issuance of credit life insurance to it's customers?

A—No, sir.

MR. KIZER: If the Court please. That allegation is based on the expressed terms of that policy, giving the creditor the right to issue these certificates. That's the question before the Court.

THE COURT: I understand. I think it is. The question is admissible.

MR. KIZER: All right sir.

Q50—You do have a separate agency known as the Yorkville Insurance Agency?

A—That's right.

Q51— —that issues credit life insurance?

A—I have a general insurance agency. The contract for credit life insurance—the certificate is issued to the bank because they are the participants of insurance in the event of loss.''

■ Let us say again that where an insurance company makes its master insurance contract with one corporate entity and authorizes it acting through its authorized officers to be its agent, and it contains the provisions shown in that master contract with the bank, and the extracts therefrom on the back of a certificate issued to the person being insured, and containing an incontestability clause as shown on page 18 of this opinion, ending with the clause stating: *"as to insurance upon the life of any Debtor becoming insured hereunder"*, we think the company is trying to say that you are becoming insured hereunder, and at the same time we are going to cancel you within 30 days and thereafter for fraud at any time, and if we decide to do so the contract shall never have been effective at all, even though the effective date is same as date of your debt to the ''Creditor''. AGAIN WE SAY such a contract as this is ambiguous and must be construed against the insurance company and in favor of the insured. (Emphasis added.)

Assuming, however, that the Supreme Court has taken the position which it proposes to require the lower Courts to act under, if the contracts do not create an ambiguity which must be construed in favor of the assured, surely under the facts of the case as stated here, the insurance company has waived its right to declare the insurance void, and is estopped from doing so, as was said in the Segars case.

■ Simply because an agent may practice a fraud upon its principal, there is no reason to assume that in so

doing the party insured also is guilty of fraud simply because the certificate may be cancelled in event of fraud.

In Industrial Life & Health Ins. Co. v. Trinkle, 185 Tenn. 434, 436, 206 S.W.(2d) 414, 415, in commenting upon the opinion in the case of DeFord v. National Life & Accident Insurance Co., 182 Tenn. 255, 185 S.W.(2d) 617, the Supreme Court, speaking through Justice Neil, said:

"Petitioner seems to be under the impression that the DeFord case announces a new doctrine which in effect overrules all the cases in this State involving the question of waiver."

It then appropriately refers to Life & Casualty Ins. Co. v. King, 137 Tenn. 685, 195 S.W. 585, 589; Independent Order of Foresters v. Cunningham, 127 Tenn. 521, 156 S.W. 192, 194, 5 A.L.R. 1569, and other cases on the same subject, and in the opinion of Justice Neil, he said:

"In the latter case it was expressly held that 'forfeitures (of life insurance policies) are not favored, and will not be enforced against equity and good conscience.' Furthermore, that an agent acting within the general scope of his apparent authority, though exceeding his authority, binds his principal. This is still the law.

"In DeFord v. National Life & Accident Insurance Co., supra, it was sought to overcome the well-settled doctrine of waiver by the plea that the agents of the company were acting beyond the scope of their authority in delivering the policy and that the insured knew that said agents would not impart to their principal material facts which might otherwise void it. A simi-

lar plea was made and overruled in the instant case and sustained by the Court of Appeals.''

After stating that even though the agents were guilty of fraud and had exceeded their authority under their contract, and that the mother of the insured in that case certainly was no party to the fraud, the Court said:

''The principle to which we gave our approval in the DeFord case is grounded upon actual fraud between the insured and the agent of the company which results in the issuance of a policy of insurance that would not have been written and delivered had the true facts been disclosed. The Court cited and expressly approved the following governing rule as found in 2 American Jurisprudence, p. 291: ''* * * Moreover, as the rule is intended to protect those who exercise good faith, and not as a shield for unfair dealing or to enable third persons to use the agent to further their own frauds upon the principal, it will not apply in favor of one acquainted with circumstances plainly indicating that the agent would not advise his principal, as where the agent is known to be acting adversely to the principal, or where the third person seeking to charge the principal is in collusion with the agent.' * * *

''We think the holding in DeFord v. National Life & Accident Insurance Co., supra, should be confined to its own facts. While it is sound in principle, for reasons stated in the opinion and upon the authorities cited, it should not be considered as stating an inflexible rule by which all future decisions of this Court are to be controlled. Whether or not the plea of waiver in a given case is good, as under the authorities cited, or is not available as held in the DeFord case, must neces-

sarily depend upon the facts and circumstances of each case under consideration.

■ That statement was approved not only in the Industrial Life & Health Ins. Co. v. Trinkle, supra, but was also quoted and approved by this Court in Life & Casualty Ins. Co. v. Jackson, 48 Tenn.App. 27, 52, 342 S.W.(2d) 720. In the instant case we have the surgeon who performed the first operation of which the agent was specifically told, and who made no further inquiry to determine what kind of an operation it was or what the surgery was performed for, and giving no information to the insurance company as an officer of the Bank of Yorkville or as an agent of the insurance company, that this proposed insured had a prior operation for any purpose or when it was accomplished, and on the other hand we have an individual who was going back to the hospital for what he thought was a minor operation. Thinking so after he had been told that it was a minor matter by the surgeon who performed the first operation.

With the proof in this record positively stating from the surgeon himself that from a clinical standpoint insured "was in good health" and had a right to believe he was in good health and that he himself thought the man would be up and about his usual work within a few days, though it turned out to be different from what they had thought.

If our doctors tell us we are in good health, and our doctors say they think we are in what could be classified as good health, if the authority directed by contract so to do, has determined that we are in good health, and issues the certificate, if the company recognizes that there is a process of insurance going on, as hereinbefore

stated, we think we have no right to say that the insured was acting in a fraudulent manner, when he could have walked up to Mr. Forrester, the alleged insurance agent and officer of the Bank, and said nothing and obtained the certificate.

On the other hand Mr. Davidson was honest enough to have told him in December 1962 that he wanted some insurance; that he didn't have the money at the time; that he would be back and obtain it, and he went back on January 8, 1963 and paid for the insurance which Mr. Forrester, acting as agent for the Bank or the insurance company, or both, accepted $100.00 in premium, issued the certificate, kept it from January 8 until January 23 or later, before he ever reported it to the insurance company, and then claimed that there was fraud in connection with the spirit of the transaction embedded in the bosom, brain and heart of the individual who wanted that insurance.

Again we say, No. 1, that the whole contract is ambiguous. No. 2, that if not ambiguous, then the activities of the creditor-agent, the insurance agent and the insurance company, all combined, to deny to the insurance company the right to defeat payment under this contract.

Assignment of error No. 3 attacking the judgment of the Court on the ground that the Court held that the creditor had a right to determine whether the insured was in sound health at the time the insurance policy was issued, and base the judgment thereof, we find nothing in the judgment as pronounced by the Court, and as embraced within the transcript, which determines the Court so held. There is some dialogue between the Court and counsel for the defendant in which the Court said some-

thing of that character, but we do not find that he carried that into his judgment.

Regardless of what the Court may say again about the ambiguity of this insurance contract, which is practically the form as in the Segars case, as hereinbefore pointed out, we are of the opinion that the proof in this case does not preponderate against the judgment of the Court in adjudging the liability of the insurance company under this certificate in favor of the secondary beneficiary, which has paid the debt and is the estate of Mr. Davidson. All assignments of errors are overruled and the judgment of the lower Court affirmed with cost, and interest from the date of the judgment below.

Carney and Bejach, JJ., concur.