**COMMONWEALTH OF PUERTO RICO,**
Plaintiff,

v.

**PAN AMERICAN LIFE INSURANCE COMPANY, Defendant.**

Civ. No. 92–65.

United States District Court
D. Puerto Rico.
Dec. 30, 1969.

---

William Naveira, San Juan, P. R., for the Commonwealth of P. R.

A. Santiago-Villalonga, for Hartzell, Fernández, Novas & Ydrach, San Juan, P. R., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CANCIO, Chief Judge.

The plaintiff, the Commonwealth of Puerto Rico's Employees Retirement System (hereinafter called the Retirement System), instituted this action against the defendant, the Pan American Life Insurance Company (hereinafter called Pan American or the Company) to recover on a credit life insurance policy issued by said defendant upon the life of one of the borrowers of the Retirement System. Admitting many of the facts stated in the complaint, the defendant answered by alleging that this borrower was not an insurable risk and that the plaintiff had failed to comply with the terms of the insurance policy inasmuch as it should have known when it attempted to extend coverage under the policy that the borrower was not an insurable risk. Pan American also contends that the borrower concealed material facts as to his physical condition and previous medical history, which were material to the acceptance of the risk, which the Company would not have assumed had it known the true facts involved.

Having thus the parties set the main issues of the case, the Court, after considering the documents submitted by stipulation and after hearing the testimony of the witnesses presented by both parties, makes the following

## FINDINGS OF FACT

During the years 1961–1962 and 1962–1963, the Retirement System contracted with Pan American whereby, in consideration of the payment of premiums, the Company insured the lives of the borrowers of the Retirement System in an amount equal to the Retirement System's debit balance of the loan, including interest and special charges.

From July 1, 1961 to June 30, 1962, the Company charged Forty Five (45) cents for each One Thousand ($1,000) dollars in the debit balance as premium,

and from July 1, 1962 to June 30, 1963, Twenty Nine (29°) cents for each One Thousand ($1,000) dollars. These premiums were discounted on a monthly basis from the borrowers' wages by the governmental agency for which they worked and were forwarded to the Treasury Department of the Commonwealth of Puerto Rico. A proof of payment was then issued by the Retirement System and sent to the Treasury Department, which in turn drew out a single check made to the order of Pan American, covering all premiums.

Under the terms of the policy, the retirement System administered the insurance plan mainly by processing the applications. Although this was the first occasion in which the Retirement System had adopted an insurance plan, no instructions, either verbally or written, were provided by the Company to the Retirement System concerning the management of the insurance plan or relating to the issuance of the insurance. Neither were instructions given to require medical examination, statements of health or written information from the applicants, and, consequently, the Retirement System did not require them from the applicants.

On several occasions, the Company payed insurance on the deaths of the insured without questioning their insurability. Never did the Company reject any of the premiums, nor did it inquire as to the identity of the persons who were covered by its policy. Only by in-ference, that is, when the Company cashed the checks of the Treasury Department, was the Retirement System able to learn that the Company had accepted the applicants.

In arriving at a final determination as to whether plaintiff acted in good faith or not, an element of importance for the disposition of this case, the Court notes that the Retirement System, after the termination of the contract with Pan American in 1963, became its own insurer and, up until the present, has followed the same procedure established under the aforementioned contract.

On August 31, 1960, the deceased, Rafael Rivera Cartagena, applied for a mortgage loan at the Retirement System. The loan was granted and Rivera Cartagena signed the mortgage deed on June 27, 1961. At Rivera Cartagena's request, the Retirement System issued him a certificate of insurance dated April 1, 1962. Thereafter, the premiums of his insurance were promptly payed during the months of April, May, June, July and August. Then, after eighteen (18) days of illness, Rivera Cartagena died on August 24, 1962. The Retirement System filed the usual death claim form with the Company, which refused to pay the $13,986.99 of the loan's debit balance.

Pan American's refusal to pay stems mainly from the fact that Rivera Cartagena's leave record shows many absences from his work due to sickness.[1] The

---

1. On cross-examination, Mr. Castillo, an officer of the defendant insurance company, admitted that he did not know whether the Company had given the Retirement System the instructions he had mentioned earlier because at that time he was not working in Puerto Rico. Plaintiff's attorney called Mr. Castillo's attention to the first paragraph of the second page of the policy, which indicates that the Company would have to *accept* application and *grant* insurance. Mr. Castillo interpreted this paragraph to require the Company's intervention in determining which borrower would be insured, only when the creditor had doubts about the borrower's insurability.

Mrs. Rosa Maria Rivera de Cruz, who works in charge of leave records in the Bureau of Payroll and Security of Work of the Department of Labor, testified for the plaintiff. Mrs. Rivera stated she was the custodian of Mr. Rivera Cartagena's leave records and had brought them to the court. (Exhibits M and N). The records covered the years 1953 through 1963. From the leave records it appears that Mr. Rivera Cartagena

1. Was absent 36 days on regular vacation and 13½ days on sick leave in 1953.

2. Was absent 45 days on regular vacation and 3 days on sick leave in 1954.

Company contends that the Retirement System failed to fulfill its obligation under the policy when it did not investigate Rivera Cartagena's insurability by inquiring at the Department of Labor, employer of the borrower, as to his absences from work.

## CONCLUSIONS OF LAW

Defendant's defense rests mainly on plaintiff's admission of the fact that he did not investigate the insurability of Rafael Rivera Cartagena. It contends that this omission voids the insurance coverage plaintiff intended to extend to the applicant, since the policy's provisions supposedly imposed on the plaintiff the duty to investigate the borrower's insurability. With regard to this contention, the only applicable clause of the policy, Clause No. 1, reads as follows:

All borrowers between the ages of 18 and 69 of the Creditor, whom the Creditor *believes to be in good health*[2] are eligible for insurance. (Emphasis supplied.)

█ Reading the policy as a whole, the phrase "whom the Creditor believes to be in good health" does not require the plaintiff to conduct an investigation relative to the applicant's health. Had the contracting parties intended otherwise, they would have so stated, as was done in the case of borrowers aged sixty, and in relation to which the policy states:

On borrowers aged 60 and over *evidence of insurability satisfactory to the Company will have to be submitted before this insurance shall go into effect.* (Emphasis supplied.)

The word "believes" in the clause in issue does not require the Retirement System to initiate an investigation nor to submit to the Company "evidence of the insurability before the insurance shall go into effect." To infer the contrary would be to inject into the insurance contract elements of uncertainty and subtlety never thought of by the contracting parties. The London Assurance v. Tribunal Superior, 95 D.P.R. 305 (1967).

Actually, under the terms of the policy, the one responsible for determining the insurability of the applicant was the Company. The first paragraph in the second page of the policy clearly states that the Company had to accept, grant and approve the applications and had the right to require medical examinations when in doubt as to the insurability of an applicant.

3. Was absent 17 days on regular vacation and 15½ days on sick leave in 1955.
4. Was absent 38½ days on regular vacation and 21½ days on sick leave in 1956.
5. Was absent 35½ days on regular vacation and 33 days on sick leave in 1957.
6. Was absent 37 days on regular vacation and 29 days on sick leave in 1958.
7. Was absent 6 days on regular vacation and 41½ days on sick leave in 1959.
8. Was absent 36 days on regular vacation and 10 days on sick leave— 10½ days of sick leave were charged to regular vacation—in 1960.
9. Was absent 31 days on regular vacation and 9½ days on sick leave in 1961.
10. Was absent from January 16 to April 2, 1962 on sick leave, which was charged to regular vacation. Returned to work on April 2, 1962 and attended regularly until August 6, 1962 when he again became sick and finally died on August 24, 1962.

2. See the following cases dealing with similar clauses:
a. Atlantic National Life Ins. Co. v. Bank of Sulligent, Ala., 125 So.2d 702, 704 (1960). "Each debtor of the creditor who is in insurable health * * *"
b. Vulcan Life Accident Insurance Co. v. Davidson, Tenn.App., 395 S.W.2d 534, 541 (1965). "* * * When the Creditor believes him to be alive and in sound health."
c. Butler v. Vulcan Life and Accident Insurance Co., La.App., 179 So.2d 642, 643 (1965). "* * * provided the Debtor is in sound health."

Defendant has tried to belittle the contents of this paragraph by saying that the usual practice in the field of insurance is to hand the creditor a set of instructions, thereby transferring these obligations to the creditor. The Court will not consider this argument since, under paragraph seven, it was provided that the policy, together with the application, constituted the entire contract between the parties.[3] Furthermore, the evidence submitted shows that in this particular case the Company did not provide the Retirement System with the set of instructions it has made reference to.

The policy states:

(7) Entire Contract

This policy, together with the application of the Creditor, copy of which is attached hereto, constitute the entire contract between the parties; and, in the absence of fraud, the statements made by the Creditor, shall be deemed representations and not warranties, and no such statement shall be used in any contest under this Policy unless it be contained in a written application and a copy of which shall have been furnished to the Creditor.

(8) Policy Incontestable After One Year

The validity of this Policy shall not be contested, except for non-payment of premiums, after it has been in force for one year from its date of issue. No statement made by an individual insured under the Policy relating to his insurability shall be used in contesting the validity of the insurance with respect to which such statement was made after such insurance has been in force prior to the contest for a period of two years during such individual's lifetime nor unless it is contained in a written instrument signed by him.

The evidence submitted by both plaintiff and defendant established that during all their transactions dealing with applications, no written statements were ever made by either the Retirement System or the borrowers. Therefore, considering these provisions, the acts or omissions not contained in written application of the Retirement System or Rafael Cartagena cannot be deemed to be warranties, and any evidence, other than that contained in a written application, is barred from judicial cognizance.

Fraud has been charged by the defendant to Rivera Cartagena. The borrower, defendant argues, should have submitted the necessary proof of individual insurability to enable the Company to make an intelligent decision of whether to accept or reject the application. But how was applicant to know that he was to submit proof of insurability in his particular case, more so when the facts indicate that this proof was never required from other applicants. And, if properly interrogated, is there any indication that Rivera Cartagena would have concealed any material fact? Obviously, defendant's defense is based on premises founded mainly on speculation:

> How is the applicant to know whether he is required to submit proof of individual insurability? Obviously, by notice from the company. But the company here directed no communication to the applicant after he had signed his application. But, the company argues, the application itself is 'evidence of individual insurability' and, since that evidence was allegedly false, there was no insurability, and no waiver of the requirement. This argument ignores language, logic and lucidity. Mutual of Omaha Insurance Company v. Bosses, 438 Pa. 250, 237 A.2d 218, pp. 219–220 (1968).

> In the absence of inquiry, insured need not disclose that he had previous fire losses for which he had collected insurance (citations); an insurer's failure to inquire into facts it considers material to the risk prior to issu-

---

3. The London Assurance v. Tribunal Superior, *supra*, 310 Article 11.180 of the Insurance Code, 26 L.P.R.A. § 1118.

ance of the policy estops insurer to object to applicant's concealment unless the concealment is tainted with a fraudulent intent. (Citations) *Mere silence on the part of the assured is not to be considered such a concealment as to void the policy.* Aliud est celare, aliud tacere. (Emphasis supplied.)

█ When an insurer issues a policy without requiring any written application, and there are no inquiries, and no voluntary statements are made by the insured, he is estopped from contesting the policy. The insurer is bound to determine the facts, and if he makes no inquiries, he cannot later shield himself with his own laxity.

From the very beginning of the insurance plan, the Company uniformly accepted all premiums without inquiry into or rejection of any of the individuals insured. In other words, it was willing to accept, and it risked accepting, all applications forwarded to it by the insured, without considering individual circumstances.[4] It misled the Retirement System which could have otherwise implemented its own insurance plan as it is now doing. The Company lured the Retirement System, which includes practically all the employees of the Commonwealth of Puerto Rico, by making this governmental agency believe that stringent physical examination as proof of insurability would be waived or that applications would be considered representations and not warranties. The doctrine of estoppel is clearly applicable. Rosario v. Atl. Southern Ins. Co. of P. R., 95 D.P.R. 759, 766 (1968).

Though credit life insurance has been developed quite recently in the insurance field, there is ample precedent for a case like the present one with its particular facts. In Butler v. Vulcan Life and Accident Insurance Co. (1965), La.App., 179 So.2d 642, at page 644, the Court stated:

> Under the circumstances here presented, where the insurance company allows the creditor bank (as its agent) *to issue a certificate upon belief the insured-debtor is in sound health* and where *no medical examination is required nor any question asked concerning insured's prior or present* health, we are of the opinion the bank was within its authority in issuing the certificate; that the insurance became effective immediately upon issuance of the certificate; and that the record evidences no fraud on the part of the bank or decedent. As a consequence the company is bound by the terms of the master policy and has waived any right to contest coverage under the incontestability clause. (Emphasis supplied.) Butler v. Vulcan Life and Accident Insurance Co., 179 So.2d 642 (1965) p. 644.

In Greensboro National Life Insurance Co. v. South Side Bank (1965), 206 Va. 263, 142 S.E.2d 551, at page 555, the following comment was made:

> Greensboro made a contract of insurance without requiring, or requesting, any information whatever relating to the health of the persons insured. Its certificate of insurance contains no conditions, limitation, or exception with respect to the health of the insured. Had Greensboro considered the health of the insured was material to the risk assumed, under the type of policy here issued, *it could have required evidence of insurability, or a medical examination of the persons to be insured, or a written application setting forth the physical conditions*

4. "Seldom is a medical examination required in group insurance. The Company, by accepting a cross-section of men actually employed, automatically eliminates those unfit or incapable of working and secures at least an average cross-section of humanity. Thus it would seem that the insurer would be required to accept each employee, regardless of his condition at the time the insurance became effective." Appleman's Insurance Law and Practice, § 44, p. 60. The fact that the Court refers to this quotation should not suggest that it ignores Clause No. 1 of the Policy.

*of such person, or at the least, it could have made an oral inquiry as to such fact.* Here, it did none. It merely assumed, through its agent or agents, that a woman, alleged to be present with the plaintiff when the application for the insurance was made, was the wife of the plaintiff. (Emphasis supplied.) Greensboro National Life Ins. Co. v. South Side Bank, 142 S.E. 2d 551, 555 (1965).

It is the opinion of the Court that, in the light of the facts and circumstances of the instant case, plaintiff is entitled to judgment with the costs of this action.

Judgment will be entered accordingly.

## JUDGMENT

In accordance with the Findings of Fact and Conclusions of Law signed today, it is hereby ordered, adjudged and decreed that defendant, Pan American Life Insurance Company, pay to the plaintiff Commonwealth of Puerto Rico the amount of $13,986.99, plus interest at six percentum per annum from the date of the borrower's death, August 24, 1962.

The defendant shall bear the costs.