IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 3, 2010 Session

**KRISTEN COX MORRISON v. PAUL ALLEN ET AL.**

**Appeal by Permission from the Court of Appeals, Middle Section
Chancery Court for Davidson County
No. 05-1489-1   Claudia Bonnyman, Chancellor**

No. M2007-01244-SC-R11-CV - Filed February 16, 2011

WILLIAM C. KOCH, JR., J., concurring in part and dissenting in part.

Insurance provides an important hedge against the uncertainties of life. It is a vital part of any individual's or family's financial planning because it provides a mechanism for spreading the risk of potential future losses. In most circumstances, persons seeking insurance coverage rely on the expertise of professional insurance agents to assist them in obtaining the desired and appropriate coverage. This appeal provides an opportunity for this Court to address and refine the principles applicable to claims against insurance agents for failure to obtain insurance coverage for their customers.

**I.**

J. Howard Morrison and Kristen Cox Morrison were married in 1997. In March 2000, Mr. Morrison purchased a $300,000 term life insurance policy from First Colony Life Insurance Company. This policy, like most life insurance policies, contained a standard incontestability clause stating that the policy would not be contestable "[w]ith respect to statements made in the application" after the policy had "been in force during the Insured's lifetime for a period of two years beginning with the Date of Issue shown in the Schedule."

The Morrisons' son was born on March 18, 2002. The contestability period for Mr. Morrison's First Colony policy expired four days later on March 22, 2002. Later in 2002, Mr. Morrison was arrested and charged with driving while intoxicated. He pled guilty to driving while impaired in December 22, 2002 and was required to drive with a restricted license for one year.

Following the birth of their son, the Morrisons decided that they should prepare a financial plan to enable them to begin putting money aside for their son's college education and for their retirement. They eventually decided to obtain professional assistance from Jody Roberts, one of Mr. Morrison's golfing buddies, and Paul Allen. Messrs. Roberts and Allen worked for Wiley Bros.– Aintree Capital, LLC as financial planners and stockbrokers. They were also licensed life and health insurance agents, although neither of them had extensive experience selling life insurance.

Mr. Morrison met with Messrs. Roberts and Allen for the first time on January 29, 2004. At that time, Mr. Morrison discussed his family's goals and objectives with them and informed them that he had purchased a $300,000 term life insurance policy in 2000 and that he and his wife owned no other life insurance. Following this conversation, Messrs. Roberts and Allen told Mr. Morrison that they would present their recommendations to the Morrisons at a later meeting.

Mr. Roberts met with both Mr. Morrison and Ms. Morrison on February 10, 2004, to present the financial planning recommendations he and Mr. Allen had prepared. Among other things, he recommended that Mr. Morrison replace his $300,000 term life insurance policy with a $1,000,000 term life insurance policy from American General Life Insurance Company and that the Morrisons also obtain a $250,000 American General term life insurance policy on Ms. Morrison. The annual premiums for these two policies were approximately the same as the premiums Mr. Morrison had been paying for his existing $300,000 life insurance policy. Mr. Roberts cautioned Mr. Morrison against dropping his existing $300,000 life insurance policy until his new policy was issued.

The Morrisons decided to obtain the new American General life insurance policies. Even though Mr. Roberts did not have the applications for the new policies with him at the February 10, 2004 meeting, he obtained some of the basic information from the Morrisons that was needed to complete these applications. Mr. Roberts passed along this information to Mr. Allen who assumed the responsibility for completing the applications for the Morrisons' new life insurance policies. According to Mr. Allen, he had separate telephone conversations with Mr. Morrison and Ms. Morrison to obtain the additional information needed to complete the applications.

In late February 2004, Mr. Allen mailed a packet of documents to the Morrisions containing the completed life insurance applications and a "Notice Regarding Replacement." Each application contained an adhesive message flag indicating where the Morrisons were to sign their applications. Ms. Morrison estimated that she and her husband received these documents between February 23 and February 25, 2004. Ms. Morrison also testified that she

and Mr. Morrison signed their applications for insurance on February 27, 2004, without reading or even scanning the applications or the accompanying documents.[1]

Messrs. Roberts and Allen obtained the signed applications for insurance and forwarded them to American General Life Insurance Company. Unfortunately, Mr. Morrison's application contained a significant error. Despite the fact that Mr. Morrison had been convicted of driving while impaired on December 22, 2002, his application stated that he had not been charged with or convicted of driving under the influence of alcohol or drugs or had any driving violations within the past five years.[2]

On May 7, 2004, the Morrisions met with a nurse who had been retained by American General to obtain their personal health information and to collect samples of bodily fluids to complete Part B of their application for insurance. Part of this process included the completion of a Clinical Reference Laboratory form.[3] In his answer to one of the questions on this form, Mr. Morrison stated that his driver's license had been restricted within the past five years.[4] The record does not contain evidence regarding the ultimate disposition of this form once it was signed by Mr. Morrison and the examining nurse.

The Morrisons' new life insurance coverage with American General became effective on May 11, 2004. On June 8, 2004, the Morrisons acknowledged in writing that they had received copies of their new American General policies. On June 14, 2004, Mr. Allen

---

[1]Despite Ms. Morrison's testimony, the following certification appears above the Morrisons' signatures on their applications for insurance:

> I have read the above statements or they have been read to me. They are true and complete to the best of my knowledge and belief. I understand that this application: (1) will consist of Part A, Part B, and if applicable, related forms; and (2) shall be the basis for any policy issued. I understand that any misrepresentation contained in this application and relied on by the Company may be used to reduce or deny a claim or void the policy if: (1) it is within its contestable period; and (2) such misrepresentation materially affects the acceptance of the risk.

[2]Question 17(E) on the application asked, "In the past five years, have any proposed insureds been charged with or convicted of driving under the influence of alcohol or drugs or had any driving violations? (If yes, list proposed insured's name, date, state, license no. and specific violation.)" The box stating that the answer was "no" was checked on Mr. Morrison's application.

[3]American General had apparently contracted with Clinical Reference Laboratory in Lenexa, Kansas, to process blood, urine, and oral fluid samples taken from persons applying for insurance.

[4]Question 3 on the Clinical Reference Laboratory form asked, "In the past 5 years, have you had a moving violation or your driver's license restricted, suspended or revoked?" On Mr. Morrison's form, the box stating that the answer was "yes" was checked and the word "restricted" was circled.

forwarded to American General the Morrisons' check for the first year's premiums for both policies. The Morrisions did not read or review their new policies after they received them. Both of these policies contained a standard clause relating to contestability that stated: "Except for nonpayment of premiums, we will not contest this policy after it has been in force during the lifetime of the insured for two years from the date of issue."

Mr. Morrison was seriously injured in a single vehicle accident on July 11, 2004, little more than one month after receiving his new American General life insurance policy. He died on July 12, 2004. Messrs. Roberts and Allen assisted Ms. Morrison in filing a claim for benefits with American General. On October 28, 2004, after investigating the claim, American General informed Ms. Morrison that it had rescinded Mr. Morrison's policy because he had stated on his application for insurance that he had not been charged with or convicted of driving under the influence of alcohol or drugs or that he had any driving violations within the past five years, even though he had been convicted of driving while intoxicated in December 2002.

On June 9, 2005, Ms. Morrison filed suit in the Chancery Court for Davidson County against Messrs. Roberts and Allen, American General, and Wiley Bros.– Aintree Capital, LLC. She filed an amended complaint on June 21, 2005 and a second amended complaint on March 16, 2006. These complaints asserted claims sounding in negligence, negligent misrepresentation, breach of contract, breach of fiduciary duty, and violation of the Tennessee Consumer Protection Act and sought the recovery of $1,000,000 – the amount of coverage under Mr. Morrison's American General life insurance policy – and treble damages and attorney's fees under the Tennessee Consumer Protection Act.

In relatively short order, Ms. Morrison agreed to settle all her claims against American General in return for a payment of $900,000. Ms. Morrison signed a general release on May 2, 2006. On May 17, 2006, the trial court entered an agreed order dismissing all of Ms. Morrison's claims against American General with prejudice.

The claims against Messrs. Roberts and Allen and the remaining defendants[5] were tried without a jury from January 29 through January 31, 2007. The trial court ruled from the bench shortly after the close of the proof and the arguments of counsel. The court concluded that the defendants breached their contract with the Morrisons by failing to procure an enforceable $1,000,000 life insurance policy on the life of Mr. Morrison. Accordingly, the court awarded Ms. Morrison $1,000,000 plus prejudgment interest. The trial court also concluded that the defendants were liable to Ms. Morrison for breach of fiduciary duty, negligence and misrepresentation for the loss of the coverage under Mr. Morrison's $300,000

---

[5]The other defendants were Allen and Roberts Group and Wiley Bros.– Aintree Capital, LLC.

First Colony life insurance policy. Accordingly, the court awarded Ms. Morrison an additional $300,000. Finally, the trial court determined that the defendants violated the Tennessee Consumer Protection Act and acted recklessly by submitting "faulty information" to American General on behalf of the Morrisons. Based on this finding, the trial court awarded Ms. Morrison her attorney's fees and doubled[6] her recovery for the loss of the coverage provided by Mr. Morrison's $300,000 First Colony life insurance policy.

On March 8, 2007, the trial court entered a final judgment for Ms. Morrison in the amount of $2,119,541.17. With regard to the breach of contract claim, the trial court awarded Ms. Morrison $1,000,000 – the amount of coverage that would have been provided under Mr. Morrison's American General life insurance policy – and $247,120.94 in prejudgment interest. With regard to the tort claims (breach of fiduciary duty, negligence, and negligent misrepresentation), the trial court awarded Ms. Morrison $300,000 – the amount of coverage that would have been available under Mr. Morrison's lapsed First Colony policy – and then doubled this amount after concluding that the defendants' "tortious actions . . . were willful and knowingly reckless, and deceptive, and in violation of the Tennessee Consumer Protection Act." The court also awarded Ms. Morrison prejudgment interest on her tort claims in the amount of $74,135.38. Finally, the trial court awarded Ms. Morrison an additional $198,285.47 in attorney's fees and costs relating to her tort claims.

Messrs. Roberts and Allen and the other defendants appealed. On January 30, 2009, the Court of Appeals filed an opinion affirming the judgment in part and modifying it in part. *Morrison v. Allen*, No. M2007-01244-COA-R3-CV, 2009 WL 230220 (Tenn. Ct. App. Jan. 30, 2009). The Court of Appeals affirmed the judgment for breach of contract and the judgment for the tort claims. However, the Court of Appeals also determined that the $1,000,000 judgment for breach of contract should be reduced by $900,000 – the amount of Ms. Morrison's settlement with American General. *Morrison v. Allen*, 2009 WL 230220, at *5-7.

Messrs. Roberts and Allen and the other defendants filed a Tenn. R. App. P. 11 application with this Court taking issue with the lower courts' disposition of Ms. Morrison's contract, tort, and Tennessee Consumer Protection Act claims. After this Court granted the application for permission to appeal on October 19, 2009, Ms. Morrison, pursuant to Tenn. R. App. P. 13(a), raised three additional issues relating to the decision of the Court of

---

[6]The Tennessee Consumer Protection Act explicitly permits trebling the damages for willful or knowing violations of the Act but does not permit doubling the damages. *See* Tenn. Code Ann. § 47-18-109(a)(3) (2001); *but see Keith v. Howerton*, No. E2002-00704-COA-R3-CV, 2002 WL 31840683, at *3 (Tenn. Ct. App. Dec. 19, 2002) (award of less than three times damages permissible based on "such other relief" language in Tenn. Code Ann. § 47-18-109(a)(3)).

Appeals to offset her judgment against the defendants by the amount of her settlement with American General and to deny her request for additional attorney's fees on appeal.

The Court has now upheld the award of $1,000,000 in damages for breach of contract for the failure of Messrs. Roberts and Allen and the other defendants to procure a policy "not subject to contest." However, it has reversed the decision of the Court of Appeals that these damages should be reduced by the $900,000 recovery Ms. Morrison received from American General. The Court has also vacated the $872,420.85 judgment awarded to Ms. Morrison based on her breach of fiduciary duty, negligence, negligent misrepresentation, and Tennessee Consumer Protection Act claims.

I concur with the Court's decision to vacate the portion of Ms. Morrison's judgment relating to the loss of the $300,000 coverage that had been available under Mr. Morrison's lapsed First Colony insurance policy.

I do not concur with the Court's conclusion that Messrs. Roberts and Allen and the other defendants breached their contract with the Morrisons by failing to procure a life insurance policy for Mr. Morrison that was "not subject to contest." I reach this conclusion because this record contains absolutely no evidence, direct or circumstantial, that the Morrisons requested or that Messrs. Roberts and Allen offered to obtain immediately incontestable life insurance policies and because it is undisputed that the Morrisons received the insurance coverage they requested. However, I have also concluded that Ms. Morrison's recovery of $1,000,000 can be sustained based on Mr. Roberts's and Mr. Allen's breach of their fiduciary duties as insurance agents to exercise reasonable skill, care, and diligence in obtaining insurance coverage for their clients.[7]

Finally, like Chief Justice Clark, I do not concur with the Court's conclusion that Ms. Morrison's $1,000,000 judgment against Messrs. Roberts and Allen should not be reduced by Ms. Morrison's $900,000 settlement with American General.

## II.

Messrs. Roberts and Allen were licensed in Tennessee as "insurance producers" which means that they were authorized to "sell, solicit, or negotiate[8] insurance." Tenn. Code Ann.

---

[7]The Tennessee Supreme Court may affirm a lower court's judgment that reaches the correct result even if it is based on different, incomplete, or erroneous grounds. *Cont'l Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986); *Hopkins v. Hopkins*, 572 S.W.2d 639, 641 (Tenn. 1978); *Martin v. Senators, Inc.*, 220 Tenn. 465, 474-75, 418 S.W.2d 660, 665 (1967).

[8]Negotiating insurance involves "conferring directly with or offering advice directly to a purchaser
(continued...)

§ 56-6-102(6) (2008).  They did not work directly for or on behalf of a particular insurance company.  Rather, they acted as middlemen between the persons seeking insurance coverage and a number of different insurance companies.  In fact, the record shows that Messrs. Roberts and Allen used a general insurance agent in Florida to obtain quotes from many different insurance companies and then used these quotes to prepare their recommendations to their clients.  When their clients accepted their recommendations, Messrs. Roberts and Allen then assisted their clients in obtaining the requested insurance coverage from the company approved by the client.

Most transactions in the insurance industry between insurance companies and insureds are conducted through intermediaries.[9]  Whether the insurance agent is the agent of the insurance company, the agent of the insured, or the agent of both, as well as the scope of the agency relationship, depends on the facts of the particular relationship in question.  1 Jeffrey E. Thomas & Francis J. Mootz, III, *New Appleman on Insurance Law, Essentials of Insurance Law* §§ 2.03[1]-[2], at 2-10 to -12, 2.03[7], at 2-21 to -23 (Library ed. 2010) ("1 *New Appleman on Insurance Law*"); 1 Leo Martinez et al., *New Appleman Insurance Law Practice Guide*, *Coverage Analysis Pre-litigation* §§ 2.04[1], at 2-19, 2.07[4][a], at 2-26 (2011) ("1 *New Appleman Insurance Law Practice Guide*").

In the typical factual scenario involving a licensed insurance agent and a client desiring to obtain or maintain insurance coverage, the agent's obligations may arise from two distinct sources.  First, when an insurance agent agrees to do something with regard to a client's insurance coverage, the agent's obligations are contractual.  3 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 46:46, at 46-60 to -61 (3d ed. 2005) ("3 *Couch on Insurance*").  Second, insurance agents, like other licensed professionals, owe a duty to their clients to perform consistent with the standards of care of their profession.  *See generally* 1 *New Appleman on Insurance Law* § 2.05[1]-[2], at 2-26 to -27; *see also* 1 *New Appleman Insurance Law Practice Guide* §§ 2.01[2], at 2-11, 2.09[1][b][i], at 2-31; 3 *Couch on Insurance* §§ 46:30, at 46-35, 46:33, at 46-42.

---

[8](...continued)
or prospective purchaser of a particular contract of insurance concerning any of the substantive benefits, terms or conditions of the contract; provided, that the person engaged in that act either sells insurance or obtains insurance from insurers for purchasers."  Tenn. Code Ann. § 56-6-102(14) (2008).

[9]Treatises often make a distinction between an "agent" and a "broker" under the law of insurance, but there are no facts in this case that necessitate delving into the differences between brokers and agents. Thus, this separate opinion uses the term "agent" in the general sense to encompass any insurance intermediary.

After an insurance agent agrees to obtain insurance for a client, he or she is acting as the client's agent.[10]  Thus, because the agent is generally operating in a representative capacity, the rights, powers, and responsibilities of the agent are governed and controlled by the rules and laws of agency.  1 *New Appleman on Insurance Law* § 2.03[2], at 2-11 to -12.  Agency is a fiduciary relationship that arises when the principal manifests assent to the agent that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests or otherwise consents to act on the principal's behalf.  Restatement (Third) of Agency § 1.01, at 17; *Knox-Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33, 36 (Tenn. 1988) ("An agent is a fiduciary with respect to the matters within the scope of his agency."); *Miller v. Ins. Co. of N. Am.*, 211 Tenn. 620, 625, 366 S.W.2d 909, 911 (1963) (quoting Bouvier's Law Dictionary's definition of an agent as "[o]ne who undertakes to transact some business, or to manage some affair, for another, by the authority and on account of the latter, and to render an account for it.").  The fiduciary nature of the agent's obligations requires the agent to act loyally in the principal's interest, as well as on the principal's behalf.  Restatement (Third) of Agency §§ 1.01 cmt. e, at 23; 8.01, at 249.

An agent's fiduciary duties to his or her principal vary depending on the parties' agreement and the scope of their relationship.  Restatement (Third) of Agency § 8.01 cmt. c, at 254.  At a minimum, an agent has a duty to act in accordance with the express and implied terms of any contract between the agent and the principal,  Restatement (Third) of Agency § 8.07, at 334, and to faithfully carry out the instructions of his or her client.  1 *New Appleman on Insurance Law* § 2.05[1], at 2-26.  "Subject to any agreement with the principal, an agent has a duty to the principal to act with the care, competence, and diligence normally exercised by [insurance] agents in similar circumstances."  Restatement (Third) of Agency § 8.08, at 343 (2006).  Thus, if an agent undertakes to perform services as a practitioner of a trade or profession, the agent "'is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities' unless the agent represents that the agent possesses greater or lesser skill."  Restatement (Third) of Agency § 8.08, cmt. c., at 346 (quoting Restatement (Second) Torts § 299A, at 73 (1965)).

---

[10]An insurance agent may act for and on behalf of both the insurance company and the insured in the same transaction unless doing so creates a conflict of interest or requires the agent to take on incompatible duties. *Insurance Premium Servs., Inc. v. Wood*, 57 Tenn. App. 514, 525-26, 420 S.W.2d 595, 600 (1967); 1 *New Appleman on Insurance Law* § 2.03[7], at 2-23; 1 *New Appleman Insurance Law Practice Guide* § 2.07[4][c][ii], at 2-26; Restatement (Third) of Agency § 3.14 cmt. c, at 264-65 (2006).  The fact that Tenn. Code Ann. § 56-6-115(b) (2008) provides that an insurance agent who negotiates an application for insurance is regarded as an agent of the insurance company does not prevent the agent's client from pursuing a contract or a tort claim against the agent. *See Campbell v. White & Assocs. Agency, Inc.*, 197 F. Supp. 2d 1104, 1108-09 (W.D. Tenn. 2002).

An insurance agent's agreement to procure insurance for a client gives rise to a legally enforceable obligation. The agent's promise to a client to obtain insurance is a contractual obligation. It also gives rise to a duty to act with reasonable skill, care, and diligence either by obtaining the requested insurance or by notifying the client in a timely manner that the insurance cannot be obtained so that the client will not be lulled into a feeling of security or put to prejudicial delay in seeking the desired insurance elsewhere.[11]

An insurance agent who undertakes to procure insurance for a client but fails to do so may, in proper circumstances, be held liable for the damages resulting from the failure to procure the insurance. *Massengale v. Hicks*, 639 S.W.2d 659, 660 (Tenn. Ct. App. 1982); 1 *New Appleman on Insurance Law* § 2.05[2][e], at 2-33 to -34; 1 *New Appleman Insurance Law Practice Guide* § 2.10[1], at 2-37; 3 *Couch on Insurance* § 46:46, at 46-60. Thus, at the election of the client, an agent who fails to procure insurance as promised may be sued for breach of contract or for negligence in the performance of the agent's professional duties. *Kosloff v. State Auto. Mut. Ins. Co.*, No. 89-152-II, 1989 WL 144006, at *5 (Tenn. Ct. App. Dec. 1, 1989) (No Tenn. R. App. P. 11 application filed); 15 Tenn. Jur. *Insurance* § 15, at 179-80 (2009); 1 *New Appleman on Insurance Law* §§ 2.05[2][a], at 2-26 to -28, 2.05[e], at 2-33 to -34; 3 *Couch on Insurance* § 46:43, at 46-57; *cf. Glisson v. Stone*, 4 Tenn. App. 71, 74-75 (1926).[12] Neither the contract nor the tort theory of recovery treats the agent as an "insurer" that the requested coverage will be procured. Rather, both theories view the agent as a professional who has breached the duty or obligation to either procure the requested insurance or to notify the client that the requested coverage has not been obtained. *See generally* 1 *New Appleman on Insurance Law* § 2.05[3][c], at 2-41.

An insurance agent has no duty to procure insurance for a client in the absence of the agent's agreement to do so. *Nidiffer v. Clinchfield Ry. Co.*, 600 S.W.2d 242, 246 (Tenn. Ct. App. 1980) (noting that "[o]ne is not liable to an insured for failing to procure insurance where there is no binding contract creating the duty"); *see generally* 1 *New Appleman on Insurance Law* § 2.05[3][a], at 2-35 to -36. An agent will not be held liable for failure to procure the proper insurance coverage when the client failed to inform the agent about the

---

[11]An insurance agent who is unable to obtain the insurance coverage requested by a client has a duty to make reasonable efforts to inform the client that the agent has not been able to obtain the requested insurance. *See Wood v. Newman, Hayes & Dixon Ins. Agency*, 905 S.W.2d 559, 562 (Tenn. 1995); *Ezell v. Assocs. Capital Corp.*, 518 S.W.2d 232, 234 (Tenn. 1974); 1 *New Appleman on Insurance Law* § 2.05[3][c], at 2-41.

[12]The Court of Appeals has recognized that an insurance agent's failure to procure insurance coverage gives rise to both a contractual claim and a negligence claim. *See Waddell v. Davis*, 571 S.W.2d 844, 848 (Tenn. Ct. App. 1978) (noting that the agent "negligently breached" the contract to obtain uninsured motorist coverage). The court erred, however, by conflating the two claims. Tennessee does not recognize a negligent breach of contract claim. *Hannon v. Alltel Publ'g Co.*, 270 S.W.3d 1, 10 n.11 (Tenn. 2008).

type of coverage required. *Cf.* 1 *New Appleman on Insurance Law* § 2.05[3][a], at 2-35 to -36. Accordingly, in order to establish the existence of a contract to procure insurance coverage, the client must produce evidence that establishes with reasonable certainty (1) the existence of the agent's legally enforceable agreement to procure the insurance and (2) the terms and conditions of the agreement. *See* 1 *New Appleman on Insurance Law* § 2.05[2][e], at 2-34 ("[P]roof that [the] prospective insured definitely directed the intermediary to obtain a particular policy, and the essential elements of the policy to be procured must be established."). When it is not clear what insurance coverage the client requested the agent to obtain, the client may not recover for the agent's failure to procure insurance. *See Coble Sys., Inc., v. Gifford Co.*, 627 S.W.2d 359, 364 (Tenn. Ct. App. 1981).

### III.

The Court has affirmed the trial court's conclusion that Messrs. Roberts and Allen breached their contract with the Morrison by failing to procure an insurance policy on Mr. Morrison's life that was "not subject to contest." I cannot agree with this conclusion because the record contains no evidence to support it.

Ms. Morrison had the burden of proving that the Morrisons requested and that Messrs. Roberts and Allen agreed to procure an insurance policy on Mr. Morrison's life that was "not subject to contest." There is abundant evidence in the record that Messrs. Roberts and Allen agreed to obtain a $1,000,000 American General term life insurance policy on Mr. Morrison's life. However, the record contains no evidence that the Morrisons requested a policy that was incontestable. Likewise, absent from the record is any evidence that Messrs. Roberts and Allen represented to the Morrisons that Mr. Morrison's American General life insurance policy would be incontestable.

The evidence is, however, undisputable that Messrs. Roberts and Allen obtained the $1,000,000 term life insurance policy they promised to obtain. American General's policy on Mr. Morrison's life took effect on May 11, 2004. Mr. Morrison also acknowledged in writing that he received and took possession of a copy of his new American General policy on June 8, 2004. In the absence of an agreement containing continuing responsibilities, an insurance agent's obligation to procure insurance for a client ends when the agent obtains the insurance coverage the client requested. *Weiss v. State Farm Fire & Cas. Co.*, 107 S.W.3d 503, 506 (Tenn. Ct. App. 2001). Upon the delivery of Mr. Morrison's policy, Messrs. Roberts and Allen discharged their contractual obligation to the Morrisons to obtain a $1,000,000 term insurance policy on Mr. Morrison's life.

In the absence of an explicit agreement to obtain an incontestable insurance policy, it would be inappropriate to imply an incontestability feature as a matter of law. It is a common practice for insurance companies to reserve their right to deny coverage based on

material misstatements in an application for insurance. However, virtually all states have enacted statutes defining the grounds for contestability and the period within which these grounds must be asserted. Today, most life insurance companies, either voluntarily or by statutory compulsion, include an incontestability clause in their policies that preserves and defines their right to contest the validity of the policy. *Suskind v. N. Am. Life & Cas. Co.*, 607 F.2d 76, 80 (3d Cir. 1979); 16 Richard A. Lord, *Williston on Contracts* § 49:92, at 663 (4th ed. 2000).

The purpose of the incontestability clause is to protect the rights of purchasers of insurance and their beneficiaries by requiring insurance companies to act with reasonable promptness if they wish to deny coverage based on misstatements in an application for insurance. *See Clement v. New York Life Ins. Co.*, 101 Tenn. 22, 29-30, 46 S.W. 561, 563 (1898) (stating that an incontestability clause "prevents the insurer from lying by and receiving the premiums during the life of the insured, and after his death . . . contesting the policy upon the ground that the insurer's [sic] representations were false"); *Norman v. Plateau Ins. Co.*, No. 88-242-II, 1989 WL 28775, at *3 (Tenn. Ct. App. Mar. 29, 1989) (No Tenn. R. App. P. 11 application filed) (holding that incontestability clauses and the statutes requiring them "are intended to foreclose stale defenses by insurers and to protect the interests of insurance purchasers and the beneficiaries of insurance policies"); *Vulcan Life & Accident Ins. Co. v. Davidson*, 55 Tenn. App. 1, 24, 395 S.W.2d 534, 544 (1965) (quoting *Humpston v. State Mut. Life Assur. Co.*, 148 Tenn. 439, 448, 256 S.W. 438, 441 (1923)) (noting that the purpose of an incontestability clause is "to create a short statute of limitations in favor of the insured, within which limited period, the insurer must, if ever, test the validity of the policy"). Subject to the requirement of the applicable statute, the length of the contestability period is within the discretion of the insurance company. *See Union Cent. Life Ins. Co. v. Fox*, 106 Tenn. 347, 354, 61 S.W. 62, 64 (1901).

Tennessee, like other states, has enacted a statute governing the right of insurance companies to contest life insurance policies. Tenn. Code Ann. § 56-7-2307(3) (2008) provides that no life insurance policy can be issued in this state without a provision stating that

> the policy . . . shall be incontestable after it has been in force during the lifetime of the insured for a specified period, not more than two (2) years from its date, except for nonpayment of premiums and except for violations of the conditions of the policy relating to naval and military services in time of war.

Consistent with this statute, American General included a provision in the insurance policy covering Mr. Morrison's life limiting its right to contest the policy on any ground other than

nonpayment of premiums to two years following the issuance of the policy. The record contains no evidence that the Morrisons objected to this provision.

In light of this record, there is no sound legal or factual basis for reading an immediate incontestability clause into Mr. Morrison's insurance policy. The Morrisons did not request or bargain for such a clause.[13] There is no evidence that Messrs. Roberts and Allen had the right to waive American General's right to contest Mr. Morrison's policy based on the misstatements in his application. Reading such a provision into Mr. Morrison's policy would be inconsistent with and contrary to the practice of the insurance business.

## IV.

Even though the record does not support Ms. Morrison's recovery based on her breach of contract claim, Ms. Morrison may still recover if her evidence provides a basis for awarding a judgment on one of the other causes of action alleged in her complaint. Ms. Morrison's complaint alleges causes of action against Messrs. Roberts and Allen for negligence and breach of fiduciary duty. Based on my examination of the record, I would find that the evidence amply supports a judgment against Messrs. Roberts and Allen for negligence in the discharge of their fiduciary obligations to the Morrisons.

When an insurance agent performs his or her services negligently to a client's injury, the agent is liable for that negligence just as would be an attorney, architect, engineer, or other professional who negligently performs services for a client. *Cf.* 1 *New Appleman on Insurance Law* § 2.05[2][a], at 2-26 to -27. A claim based on the breach of fiduciary duty is a tort claim. *Mike v. Po Grp., Inc.*, 937 S.W.2d 790, 795 (Tenn. 1996). Thus, if an insurance agent obtains insurance coverage for a client that is subsequently rescinded by an insurance company because of the agent's negligence, the client may pursue a tort claim against the agent. *Cf.* 1 *New Appleman on Insurance Law* § 2.05[3][a], at 2-35 (Agent is "liable if . . . insurance . . . is materially deficient in some way"). This remedy is distinct from any contract claim the client may have. *Cf.* 1 *New Appleman on Insurance Law* § 2.05[2][f], at 2-34.

---

[13]The record contains no evidence that American General offered for sale term life insurance policies that were immediately incontestable or, if it did, that the Morrisons would have been willing or able to pay the increased premiums that such policies would have required. Had such a policy been available to the Morrisons, American General would not have agreed to issue the policy until it had thoroughly investigated Mr. Morrison's application. This investigation would have produced the same information on which American General later contested the validity of Mr. Morrison's policy. Accordingly, American General would most likely never have agreed to insure Mr. Morrison's life.

In marked contrast to the absence of contract-related findings of fact in the trial court's oral findings of fact, the trial court made numerous, specific findings of fact and conclusions of law with regard to Ms. Morrison's negligence and breach of fiduciary claims. These findings and conclusions include:

A.  Mr. Allen understood that he was Mr. Morrison's agent.

B.  Messrs. Roberts and Allen had a fiduciary relationship with the Morrisons and owed them a duty of undivided loyalty.

C.  Messrs. Roberts and Allen were untruthful when they stated on the agent's report that they personally saw the Morrisons on the date of the application.

D.  Messrs. Roberts and Allen failed to advise the Morrisons that it could be against their interest to let the First Colony policy lapse as soon as the American General policy was issued because the American General policy could be contested.

E.  Mr. Allen checked the box on Mr. Morrison's insurance application stating that he had not been charged with or convicted of driving under the influence, even though neither he nor Mr. Roberts had posed this question to Mr. Morrison.

F.  Messrs. Roberts and Allen negligently failed to warn the Morrisons of the danger that inaccurate answers on their applications could invalidate their new insurance policies.

G.  Messrs. Roberts and Allen failed to explain adequately, truthfully, or accurately the characteristics of the new insurance policies, particularly the fact that the First Colony policy was incontestable while the new American General policy was not.

H.  Messrs. Roberts and Allen provided "faulty information" to American General on behalf of the Morrisons.

I.  Messrs. Roberts and Allen acted recklessly in processing the Morrisons' applications.

J.  Messrs. Roberts and Allen breached their fiduciary duties to the Morrisons by failing to adequately and properly provide Mr. Morrison's application for insurance to American General.

K.  The conduct of Messrs. Roberts and Allen fell below the standard of care for insurance agents.

The evidence in the record does not preponderate against these findings and conclusions. It supports a finding that the conduct of Messrs. Roberts and Allen fell below the standard of care of insurance agents in the following particulars: (1) the manner in which they obtained the information they included in Mr. Morrison's insurance application; (2) they placed inaccurate or unsubstantiated information on Mr. Morrison's insurance application; (3) they failed to advise the Morrisons that the First Colony policy was incontestable while their new insurance policies were subject to being contested for two years after they were issued; (4) they failed to advise the Morrisons that American General had the right to rescind the new policies for material misstatements in their applications for insurance; (5) they failed to advise the Morrisons to review and verify the accuracy of the information on their applications before they signed them; and (6) they failed to advise the Morrisons to review their policies after they received them.

The negligent conduct of Messrs. Roberts and Allen caused erroneous information to be included on Mr. Morrison's insurance application, and this materially erroneous information provided American General with grounds to refuse to honor Ms. Morrison's claim following her husband's death. American General's contest of her husband's insurance policy deprived Ms. Morrison of the benefits that would otherwise have been paid under the policy. Accordingly, Ms. Morrison has proved all the elements of a negligence claim.

Messrs. Roberts and Allen argue that they should be excused from liability for their negligence because the Morrisons failed to read their applications for insurance before signing them and because the Morrisons failed to examine their new American General policies after receiving them. Persons applying for insurance are well-advised to review their application carefully before signing it and submitting it to the insurance company. Should an insurance company later seek to contest a policy based on misstatements in the application, the "I didn't read it" defense will be of no avail when the application contains a provision certifying that the statements in the application are correct. *See Beasley v. Metropolitan Life Ins. Co.*, 190 Tenn. 227, 232, 229 S.W.2d 146, 148 (1950); *Smith v. Tennessee Farmers Life Reassurance Co.*, 210 S.W.3d 584, 591 (Tenn. Ct. App. 2006).

However, because of the fiduciary relationship between an insurance agent and a client, it has traditionally been held that a client's failure to read the application or the policy is not a defense to a client's failure to procure claim against an insurance agent. *See Nat'l Old Line Ins. Co. v. Lane*, 323 S.E.2d 707, 710 (Ga. Ct. App. 1984); *Aden v. Fortsh*, 776 A.2d 798, 802 (N.J. 2001); *Insurance Network of Tex. v. Kloesel*, 266 S.W.3d 456, 477-78 (Tex. Ct. App. 2008); 3 *Couch on Insurance* § 46:69, at 101. When a client entrusts and

relies on an insurance agent to obtain insurance, the client's failure to read the application or policy is not fatal to the client's claim. *See Bell v. Wood Ins. Agency*, 829 S.W.2d 153, 154 (Tenn. Ct. App. 1992); *Glisson v. Stone*, 4 Tenn. App. at 79. Thus, while the failure of a client to read his or her application or policy may be fatal with regard to the client's claim against the insurance company, it is not fatal with regard to a failure to procure claim against the insurance agent.

The Morrisons did not fill out their own insurance applications. Messrs. Roberts and Allen took on this responsibility. The Morrisons did not have extensive experience with obtaining insurance, and so it was not unreasonable, relying on Messrs. Roberts's and Allen's professed expertise, to assume that their agents would properly and completely complete their applications.[14] Thus, when the Morrisons were presented with completed applications with instructions stating simply to sign them, the fact that they complied with these instructions without reviewing the applications does not undermine Ms. Morrison's negligence and breach of fiduciary claims against Messrs. Roberts and Allen.

## V.

Finally, the Court has reversed the decision of the Court of Appeals that Messrs. Roberts and Allen are entitled to a credit against Ms. Morrison's $1,000,000 judgment against them in the amount of Ms. Morrison's $900,000 settlement with American General. Like Chief Justice Clark, I have concluded that this credit is not only appropriate, it is required.

In most jurisdictions, when an agent undertakes to obtain insurance coverage but fails to do so, the agent becomes liable to the client for the amount that would have been payable under the requested policy. 1 *New Appleman on Insurance Law* § 2.05[2][f], at 2-34; 3 *Couch on Insurance* § 46:74, at 46-109 to-111. Many courts explain that in failure to procure cases, the agent, when found liable, steps into the shoes of the insurance company and becomes liable to pay the uninsured loss. *See, e.g., Commercial Ins. Consultants, Inc. v. Frenz Enters., Inc.*, 696 So. 2d 871, 873 (Fla. Dist. Ct. App. 1997); *Robinson v. J. Smith Lanier & Co.*, 470 S.E.2d 272, 273-74 (Ga. Ct. App. 1996); *Milgrim v. Royal & Sunalliance Ins. Co.*, 906 N.Y.S.2d 572, 574 (N.Y. App. Div. 2010); *Kobbeman v. Oleson*, 1998 SD 20, ¶ 5, 574 N.W.2d 633, 635.

---

[14]Because the evidence does not preponderate against the trial court's finding that Messrs. Roberts and Allen did not ask Mr. Morrison whether he had been charged with or convicted of driving under the influence within the past five years, this case does not involve a circumstance in which the client gave false information to the agent.

As a general rule, the measure of damages in failure to procure cases, whether the claim is based on contract or tort, is the amount that the client would have been entitled to receive under the insurance policy had it been procured. Thus, an insurance agent's liability on a failure to procure claim is limited to the amount of the proposed policy. *Robinson v. J. Smith Lanier & Co.*, 470 S.E.2d at 273-74. There is no dispute in this case that American General would have been required to pay Ms. Morrison $1,000,000 had Messrs. Roberts and Allen not breached their duty to fill out the Morrisons' applications for insurance accurately and completely.[15] Thus, the limit of Messrs. Roberts's and Allen's liability of failure to procure is $1,000,000.

It is not uncommon in cases of this sort for clients to sue both the insurance company and the insurance agent. When the client settles with the insurance company for the full amount of the coverage under the requested policy, the client cannot proceed with a failure to procure claim against the insurance agent because the client has been fully compensated. *See, e.g., Scheideler v. Smith & Assocs., Inc.*, 557 N.W.2d 445, 450 (Wis. Ct. App. 1996). However, when the amount of the client's settlement with the insurance company is less than the full amount of the anticipated coverage, the client may pursue a failure to procure claim against the insurance agent. *See, e.g., Schurmann v. Neau*, 2001 WI App. 4, ¶ 19, 624 N.W.2d 157, 163-64. When a client obtains a judgment against an insurance agent on a failure to procure claim, the amount of the client's recovery from the insurance company should be deducted from the judgment against the agent. *See, e.g., Johnson & Higgins of Alaska, Inc. v. Blomfield*, 907 P.2d 1371, 1375-76 (Alaska 1995).

Ms. Morrison's claims against both American General and Messrs. Roberts and Allen arise from the $1,000,000 policy on Mr. Morrison's life. Ms. Morrison settled her claim against American General for $900,000. While the trial court properly concluded that Messrs. Roberts and Allen were liable to Ms. Morrison on her failure to procure claim, the trial court should have deducted the amount of Ms. Morrison's settlement with American General from the damages awarded against them. Accordingly, I would affirm the Court of Appeal's decision on this point.

---

[15]Had Mr. Morrison's $1,000,000 American General term life policy been properly obtained, Ms. Morrison would not have received $300,000 in benefits under the First Colony policy. The record contains no evidence that the Morrisons planned to keep both the First Colony policy and the American General policy in force. To the contrary, it is undisputed that the Morrisons planned to allow the First Colony policy to lapse after the American General policy was issued. Thus, there is no basis to conclude that Ms. Morrison would have been entitled to death benefits under the First Colony policy, as well as benefits under the American General policy.

## VI.

In summary, I concur with the Court's decision in Section I of its opinion that Ms. Morrison is entitled to recovery on her failure to procure claim, although on different grounds than those relied upon by the Court. However, I do not concur with the Court's decision in Section II of its opinion to reverse the decision of the Court of Appeals that Ms. Morrison's judgment against Messrs. Roberts and Allen should be reduced in the amount of Ms. Morrison's settlement with American General. I concur with the portion of Section III of the Court's opinion finding that Ms. Morrison is not entitled to recover damages for the coverage under the First Colony policy. I concur with Section IV of the Court's opinion. I concur with the Court's conclusions in Section V of the Court's opinion, although on different grounds. Finally, I concur with Section VI of the Court's opinion.

_____
WILLIAM C. KOCH, JR., JUDGE